In the Matter of the Transfer Tax upon the Estate of FRED-ERICK TOWNSEND MARTIN, Deceased.

THE COMPTROLLER OF THE STATE OF NEW YORK, Appellant, v. METROPLITAN TRUST COMPANY, as Executor, etc., of FRED-ERICK TOWNSEND MARTIN, Deceased, Respondent.

(*Supreme Court, Appellate Division, First Department, May 5, 1916.*)

TAX—TRANSFER TAX—PROOF NOT ESTABLISHING FOREIGN RESIDENCE—DOMI-CILE AND RESIDENCE SYNONYMOUS FOR PURPOSE OF TAXATION.

Appeal from an order of a Surrogate's Court determining that the estate of a decedent was exempt from a transfer tax upon the ground that he was not a resident of this State. Evidence examined, and *held*, that the decedent was in fact a resident of this State and that a transfer tax should be imposed.

Although there is a difference between the legal meaning of the terms of "residence" and "domicile," they are synonymous for the purpose of imposing a transfer tax and the domicile of a decedent, not his residence, may control.

Although the statute of this State uses the word "resident" a person's residence may be determined by applying the principles of domicile and relying upon the authorities relating thereto.

The mere fact that a person who had resided chiefly. in hotels in the city of New York, having been left a bequest of household furniture leased a house in the city of London for the purpose of storing furniture did not make him a resident of England so as to exempt his estate from a transfer tax, especially where letters written shortly before his death show that he considered himself an American citizen and he stated therein that he considered New York to be his home.

APPEAL by the Comptroller of the State of New York from an order of the Surrogate's Court of the county of New York, entered in the office of said Surrogate's Court on the 18th day of February, 1916.

John B. Gleason, for the appellant.

John B. Pine, for the respondent.

SMITH, J.— This order held that the estate of the decedent Martin was not liable to a tax in New York on its transfer on the ground that he was not a resident of the State.

Frederick Townsend Martin was born in Albany in 1849 and remained there until 1885, when he removed to New York city and rented a house there. Some time previous to 1890 he gave up this house and thereafter when in New York he visited his sister or lived at the Murray Hill Hotel, and from 1907 on he occupied a suite of rooms at the Plaza. He always had the same rooms, and kept a few belongings there, but only paid for the suite during actual occupancy. Up to February, 1913, Mr. Martin always spent the winter, with the exception of an occasional trip to Palm Beach, in New York city. During the summer he went abroad, stopping in London hotels, and while in Paris living at an apartment which appears to have been furnished and maintained by Mr. Martin and his intimate friend, Mr. Sands.

In February, 1913, while Mr. Martin was in New York city, his brother, Bradley Martin, died in London and Mr. Martin went over, returned to New York in April, but went back to England again in July and remained there until his death in London in March, 1914. In December, 1913, his friend, Mr. Sands, died leaving Mr. Martin his personal effects and $25,000 cash. Mr. Martin immediately gave up the Paris suite and purchased a house in England, to which he removed Mr. Sands'

and his own furniture and which he proceeded to fit up as a residence.

The surrogate in reaching his conclusion that Mr. Martin died resident abroad (See 94 Misc. Rep. 81), relied almost solely on the circumstances of the purchase and outfitting of this house in London as a residence. Undoubtedly this London house was meant to be his residence in the sense that Mr. Martin intended to lodge there when in London. It is also true, as was said by the learned surrogate, that in many instances there is a difference between the legal intendment of the terms "residence" and "domicile" (Matter of Newcomb, 192 N. Y. 250), but in the matter of succession and transfer taxes the theory of the action of the taxing power renders the terms synonymous. In the case of succession the intestate's personalty is distributed according to the Statute of Distributions of the State of the domicile. Therefore, that State which permits the inheritance is entitled to impose a duty on that privilege irrespective of the "residence" — using the term in its loose sense of temporary lodging — of the intestate. The same principle governs transfer under a will, as the law of the State of the domicile of the testator determines the validity of the will as a distribution of personalty.

Although in regard to other statutes the courts have often declared that the terms "residence" and "domicile" were synonymous, the question of the proper interpretation of the word "resident" in the Transfer Tax Law (Tax Law [Consol. Laws, chap. 60; Laws of 1909, chap. 62], art. 10, as amd.; Id. § 220, as amd. by Laws of 1911, chap. 732; since amd.) does not seem to have been decided, but in numerous cases under the statute the surrogates have determined a person's residence by applying the principles of domicile and by relying on authorities as to domicile. (Matter of Rothschild, 86 Misc. Rep. 364; Matter of Wise, 84 id. 663; Matter of Rutherford, 88 id. 414; Matter of Crosby, 85 id. 679.)

It is clear that Mr. Martin's domicile up to the purchase of this London house was New York, and the burden of proof rests on the party desiring to show a different one. (Matter of Newcomb, 192 N. Y. 238.) The only fact tending to show another is the purchase of the London house, and there are a number of circumstances to explain or offset the significance of this fact.

In the first place, Mr. Martin seemed to consider himself under a duty to provide a home for Mr. Sands' collection, and in his letter of December 19, 1913, he refers to the London house as purchased solely for that purpose. The unfinished letter written just before his death to Mrs. Dewey is very significant as to his attitude toward his London house. It reads in part as follows:

"You will understand so well that it was a frightful disappointment to me to be forced by sickness to give up my winter in my beloved Land. * * *

"I have bought the lease of a house in London for eight years, as Mr. Sands, who was my dear, devoted friend from boyhood, died in Paris last November, quite suddenly and left me a legacy to buy the lease of a house where I could keep all the furniture and pretty things that we had bought together during the long years of our friendship. I look upon it as only a storehouse to keep these things in, as nothing would induce me to live in Paris after his death. My home is in New York, where I am happier than in any other city in the world. * * *

"But just think of it, that I, an American, should have brought out a book that was the book of the year in England."

Then, on another occasion he wrote: "I think it is better for you to enter 6, Great Cumberland Place, as my permanent address, as Trustee to Lord Craven," thus indicating that he considered it his permanent house only for a limited purpose.

Mr. Martin did nothing to transfer any of his business in-

terests, etc., to London, and he allowed to stand his will previously made, which gave his residence as New York. On the whole, the evidence seems definitely to show that Mr. Martin still considered New York city as his domicile, and, taking into consideration Mr. Martin's wealth and habits of life, the purchase of a private residence in a city where he was accustomed to spend a considerable portion of his time does not have the significance that would attach to a like action by a person of a less cosmopolitan character.

The order should be reversed, with costs, and matter remitted to the surrogate for the purpose of fixing the amount of the transfer tax.

CLARKE, P. J., McLAUGHLIN, SCOTT and DAVIS, JJ., concurred.

Order reversed, with costs, and matter remitted to surrogate as stated in opinion.